**ED PATTERSON**                                                **CIVIL ACTION**

**VERSUS**                                                          **NO. 13-6293**

**OMEGA PROTEIN, INC.**                                  **SECTION C(1)**

## OPINION

This case concerns a personal injury claim made by the plaintiff, Ed Patterson, Jr., against

his employer, Omega Protein, Inc. ("Omega"). The Court held a bench trial on the Jones Act liability

issues in this case on July 14, 2014.[1] Having considered the testimony and evidence at trial, the

depositions submitted in lieu of live testimony, the arguments of counsel, and the applicable law,

the Court now enters the following findings of fact and conclusions of law in accordance with

Federal Rule of Civil Procedure 52(a).[2] Specifically, the Court finds that Omega Protein, Inc.

("Omega") is vicariously liable to plaintiff for the negligence of its employee, Ben Turrell in failing

to assist plaintiff; plaintiff is liable for failing to either let go of the net or request help. Plaintiff shall

be liable for seventy (70) percent of his own damages; Omega shall be liable for thirty (30) percent.

## FINDINGS OF FACT

Plaintiff injured his back on June 12, 2013, while working on a fishing vessel, the F/V G.P.

AMELIA, that was owned and operated by Omega.[3] Plaintiff was working as part of a 15-member

purse fishing crew for Omega in Breton Sound in Louisiana when he was injured.[4] Purse fishing uses

---

[1] (Rec. Doc. 52.)

[2] To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

[3] (Trial Tr. 9:4-9, 29:13-18, July 14, 2014.)

[4] (*Id.* at 9:10-11, 59:12-13.)

a steamer, two purse boats, and a spotter plane.[5] The purse boats, under the command of either the captain or the mate, tow a single net in tandem to the area where the spotter plane or the crew has located fish.[6] After the purse boats gather the fish in the net, their bows meet, and the crew tightens the net around the fish using a purse line.[7] The fish gathered in the net are one set.[8] Once the net is closed, the set is pumped out onto the steamer, to be estimated and transported back to the plant.[9] The plant counts the total catch for the day.[10]

In addition to a captain or mate, each purse boat has four other crew-members, including a bowman or bunt pile man, a ring setter, and a cork man or seine setter.[11] The crew members have different jobs once the purse boats capture the fish or "make the set."[12] The bunt pile men secure the net as its being set out from behind the boat and spread it out for the next set.[13] The ring setter handles the rings that are used to close the bottom of the net and ties everything back.[14] The cork man/seine setter ties the cork off.[15] The mate or his equivalent on board the captain's boat removes

---

[5] (*Id.* at 26:19-27:7.)

[6] (*Id.* at 27:19-22.)

[7] (*Id.* at 31:9-17.)

[8] (*Id.* at 17:13-14.)

[9] (*Id.* at 31:5-8.)

[10] (*Id.* at 34:5-21.)

[11]  (*Id.* at 63:1-3, 104:10-15.)

[12] (*See id.* at 105:8-106:2; Ex. 19, at 16:8-11; Ex. 20, at 14:21-25)

[13] (Trial Tr. 104:19-22; William Eldridge Dep. 25:12-26:18, April 2, 2014.)

[14] (Trial Tr. 105:14-18; Ex. 20, at 13:13, Eldridge Dep. 27:4-19, 29:6-30:5.)

[15] (Trial Tr. 13:13-14.)

slack from the net by pulling on it at the front of the boat.[16] When the other crew-members finish,

it is their job to help the mate, or his equivalent in the captain's boat, pull up the net at the bow.[17]

On a big set, the crew can use a strap and hook on the boat as a make-shift pulley to raise the net.[18]

The captain or mate decides whether this strap should be used.[19]

The purpose of pulling the net up at the end of the set is to remove the pocket of fish that

happens naturally when the fish try to escape toward the front.[20] The net is pulled to guide the fish

back to the center before the crew ties the net off.[21] If the crew does not get the net up fast enough,

the fish can burst through the pocket or, in the case of shallow water, drive the net down into the

mud and tangle it.[22] Untangling the net can take hours.[23] The time spent untangling or replacing a

net can be costly to the crew, who are paid in part based on the number of fish they catch.[24]

At the time of his accident, plaintiff was working as the mate.[25] A crew member named Ben

Turrell was serving as one of two bowmen/bunt pile men on the mate's boat.[26] Captain Harcum had

---

[16] (*Id.* at 52:21-24.)

[17] (*Id.* at 106:3-7.)

[18] (*Id.* at 75:21-76:5.)

[19] (*Id.* at 76:4-5.)

[20] (Id. at 31:19-33:14.)

[21] (*Id.* at 33:4-7.)

[22] (*Id.* at 10:20-11:10, 13:24-15:4.)

[23] (*Id.* at 14-16-18, 15:4-7, 66:22-67:5.)

[24] (*Id.* at 24:24-25:8, 59:6-14, 99:24-100:8.)

[25] (*Id.* at 27:6-12.)

[26] (*Id.* at 67:13-16, 76:24-77:3.)

worked with Turrell on one previous fishing season years before and did not consider him a particularly good worker.[27] The Captain brought Turrell along for the 2013 season as a last resort. Due to difficulty obtaining H2A visas, the seasonal workers that Captain Harcum had hoped to rely on from Mexico had not made it in time for the season.[28] The Captain's only choice was to take Ben Turrell or not fish.[29]

Turrell was relatively inexperienced.[30] Before the accident, he was generally unreliable and at times even insubordinate.[31] Although plaintiff had discussed Turrell's problems with the Captain, no incident was bad enough to cause plaintiff to write Turrell up formally.[32]

The crew brought in four sets on the day of the accident.[33] At the end of the first three sets, Ben Turrell did not help pull up the net; instead he went over to the Captain's boat.[34] Plaintiff and the Captain reprimanded him and told him to stay in his own boat.[35]

At the end of the fourth set, Ben Turrell did not hop over to the Captain's boat.[36] Plaintiff began pulling up the net unassisted, and pulled for somewhere between 5 and 20 minutes, until his

---

[27] (*Id.* at 88:20-89:23.)

[28] (*Id.* at 59:4-8, 89:24-90:5, 91:6-9.)

[29] (*Id.* at 59:9-15; 90:20-22.)

[30] (*Id.* at 73:16-21, 97:21-23.)

[31] (*Id.* at 59:19-60:8, 91:13-95:3.)

[32] (*Id.* at 18:9-10, 35:20-36:1.)

[33] (*Id.* at 33:22-34:1, 38:5-8; Ex. 6-0003.)

[34] (Trial Tr. 17:2-7.)

[35] (*Id.* at 17:8-12.)

[36] (*Id.* at 17:17-19.)

back gave out.[37] Martin Melton, the Captain's son and plaintiff's soon to be son-in-law, was working on the Captain's boat at the time as the mate-in-training.[38] Realizing that plaintiff needed help, he hopped over to the mate's boat to assist.[39] Plaintiff and Melton finished pulling the net into the Mate's boat together.[40] During this time, Ben Turrell was standing idly by.[41]

Plaintiff went with the crew back to the dock and waited while the bailers pumped the fish out of the steamer.[42] On Thursday and Friday, he went back out on the boat, but Captain Harcum had him sit on the boat and refrain from any physical activity.[43] On Thursday, the Captain noted that plaintiff was walking gingerly, and asked whether he would like to go to the hospital; plaintiff declined.[44] On Friday, when plaintiff signed off the boat, he wrote that he had <u>not</u> been injured on the company sign-out sheet.[45] He thought that he could keep working.[46]

When plaintiff came back to the boat on Sunday, he was in more pain.[47] He told the Captain

---

[37] (*Id.* at 12:23-13:6; Ex. 19, at 25:18-19.)

[38] (*Id.* at 56:6-24, 74:3-10.)

[39] (*Id.* at 64:8-16.)

[40] (*Id.* at 64:14-16.)

[41] (*Id.* at 17:17-21.)

[42] (*Id.* at 37:13-18.)

[43] (*Id.* at 39:15-21.)

[44] (*Id.* at 110:5-12.)

[45] (*Id.* at 40:4-14; Ex. 12-001.)

[46] (Trial Tr. 41:8-10.)

[47] (*Id.* at 41:11-13.)

who contacted Denver Damron, the plant safety manager.[48] Damron came on board the boat and had

plaintiff fill out an accident report.[49] He made arrangements for plaintiff to go to the hospital on

Monday, June 17.[50] Plaintiff went back to the hospital on June 19.[51] A claims representative from

Omega, Charles David Ott, met plaintiff at this appointment and conducted a recorded interview

after he received some injections for his back pain.[52] In investigating this claim, Mr. Ott also

interviewed Martin Melton and Captain Harcum and took statements from both men.[53]

The Sunday following plaintiff's accident, Captain Harcum reprimanded Ben Turrell for his

bad attitude.[54] Omega eventually terminated Turrell, on Captain Harcum's recommendation, for

being late to the boat three times within a 90-day probationary period.[55] This lawsuit followed on

October 30, 2013.[56]

## PROCEDURAL HISTORY

Plaintiff instituted this action seeking maintenance and cure, Jones Act damages, and

damages for unseaworthiness.[57] The Court granted summary judgment on all of plaintiff's

---

[48] (*Id.* at 41:14-20.)

[49] (*Id.* at 41:21-42:2; Ex. 10-001.)

[50] (Trial Tr. 43:22-24.)

[51] (*Id.* at 113:2-114:19.)

[52] (*Id.*; Ex. 19.)

[53] (Trial Tr. 77:19-22; Ex. 20)

[54] (Trial Tr. 98:2-17.)

[55] (*Id.* at 98:18-99:7; Exs. 3-001, 3-002.)

[56] (Rec. Doc. 1.)

[57] (*Id.*)

unseaworthiness claims and his Jones Act claims related to the failure to conduct a Job Safety Analysis and provide mechanical lifting equipment.[58] The Court held a bench trial on plaintiff's remaining Jones Act liability claims on July 14, 2014.[59]

## CLAIMS & DEFENSES

Plaintiff raises three claims under the Jones Act. First, he claims that Omega is vicariously liable for Ben Turrell's negligence in ignoring plaintiff's request for help and failing to assist him.[60] Next, plaintiff argues that Omega is directly liable for negligently hiring and retaining Ben Turrell.[61] Finally, he argues that Omega is vicariously liable for Captain Harcum's decision to put Ben Turrell on the crew during the 2013 fishing season.[62]

Omega argues in defense that this accident was solely caused by plaintiff's failure to exercise reasonable care in pulling up the net.[63] It contends that plaintiff negligently failed to wait for help before pulling up the net, that he failed to request any help, and that he unreasonably continued to pull despite the fact that he had no help.[64] Omega leverages in part the primary duty doctrine to make these arguments.[65]

---

[58] (Rec. Doc. 40.)

[59] (Rec. Docs. 43, 46 & 52.)

[60] (Rec. Doc. 44 at 12.)

[61] (*Id.*)

[62] (*Id.*)

[63] (*Id.*)

[64] (*Id.*)

[65] (*Id.*)

**CONCLUSIONS OF LAW**

The Court has subject matter jurisdiction over these Jones Act claims pursuant to 28 U.S.C. § 1333. Venue is proper in this district.

I. Standards for Analysis

The Jones Act, 46 U.S.C. § 30104(a), gives a seaman a cause of action against his employer for negligence.[66] A Jones Act employer owes a seaman a duty of reasonable care.[67] The employer is liable to the seaman if his negligence is the cause, in whole or in part, of his injury.[68] The Jones Act simultaneously obligates the seaman to act with ordinary care under the circumstances, with respect to his own well-being.[69] The seaman must act with the care, skill, and ability expected of a reasonable seaman.[70]

Comparative negligence applies under the Jones Act, "barring an injured party from recovering for the damages sustained as a result of his own fault."[71] The defendant has the burden to prove plaintiff's negligence and a causal relationship with his injury.[72] "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to

---

[66] *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 415, 129 S.Ct. 2561, 2570, 2009 A.M.C. 1521 (2009).

[67] *Verret v. McDonough Marine Serv.*, 705 F.2d 1437, 1441 (5th Cir. 1983).

[68] *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).

[69] *Id.* at 339.

[70] *Id.*

[71] *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989) *aff'd sub nom. Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990).

[72] *Id.*

his share of fault."[73] A defendant must bear responsibility if his negligence played any part, even the slightest, in producing an injury.[74] The primary duty doctrine, to the extent still applicable in Jones Act cases, is only an absolute bar to recovery if the seaman has caused his own injury by breaching a primary duty to his employer *and* the employer is completely free from fault.[75]

Vicarious liability is applicable under the Jones Act, making a Jones Act employer liable for negligent acts of one seaman that produce another's injury, where the negligence occurred "in the course of employment."[76]

II. Analysis of Claims and Defenses

*A. Plaintiff was not Negligent for Failing to Wait for Help before Trying to Pull Up the Net.*

In the pretrial order, Omega argued that plaintiff was negligent for failing to wait for help before he made any attempt to pull up the net.[77] The evidence submitted does not support this argument.

It was the mate's duty to see that the net was raised at the end of the set.[78] The responsibility

_____

[73] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006)

[74] *Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir. 1982) (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)).

[75] *See Nelon v. Cenac Towing Co. LLC*, No. 10-373, 2011 WL 289040 at *16-17 (E.D. La. Jan. 25, 2011).

[76] *Beech v. Hercules Drilling Co.*, L.L.C., 691 F.3d 566, 571 (5th Cir. 2012) cert. denied, 133 S. Ct. 1460, 185 L. Ed. 2d 363 (U.S. 2013); *see also Kersey v. American River Transp. Co.*, 353 F. Supp. 2d 683, 696 (E.D. La. 2004) (quoting Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-22, at 348 (4th Ed. 2004)).

[77] (Rec. Doc. 44 at 12.)

[78] (Trial Tr. 52:21-24; Arnold Davis Dep. 11:19-25, April 2, 2014; Eldridge Dep. 25:22-26:6.)

9

begins when the rest of the crew on the mate's boat is doing other tasks at the stern.[79] The mate is

not supposed to wait for the crew to finish to start this process; the longer he waits, the heavier the

net gets, and the more likely it is that the fish will tangle or tear the net.[80] As Mr. Melton explained

to Mr. Ott, the captain's boat and the mate's boat are supposed to finish pulling in their nets at the

same time.[81]

The issue here is not whether it was possible for plaintiff to wait to pull up the net - clearly

it was - but rather, whether a reasonable mate in his position would have waited to start. No one has

argued that plaintiff was dealing with a particularly large set that should have prompted extra

precautions like the slinging strap.[82] A reasonable mate in plaintiff's position would have started

trying to get the slack out of the net, expecting that his crew would be finished what they were doing

in time to help him as needed. Indeed, as explained below, Ben Turrell did finish in time to help. For

whatever reason, he chose not to.

### B. Plaintiff and Ben Turrell were Concurrently Negligent while Plaintiff was Attempting to Bring Up the Net.

Plaintiff claims that Omega is vicariously liable to him for the negligence of Ben Turrell in

failing to help pull up the net, when that was part of Ben Turrell's job and plaintiff specifically

requested his assistance multiple times.[83] Omega counters that plaintiff never requested Ben

---

[79] *See supra* note 78.

[80] (Trial Tr. 65:6-10; Eldridge Dep. 27:20-28:12.)

[81] (Ex. 20, at 7:5-6.)

[82] (*See* Trial Tr. 75:11-15; Ex. 19, at 25:12-13.)

[83] (Rec. Doc. 56 at 2-4.)

Turrell's assistance and has only recently made this claim to conceal his own negligence in failing

to ask for any help or release the net before he was injured.[84] The Court agrees with Omega, but only

in part.

First, it does not appear that plaintiff asked for help to lift the net. Although at trial, plaintiff

testified that he asked for Turrell's help at least four times,[85] plaintiff directly contradicted this

testimony in his recorded statement to Charles Ott, made a week after the accident. Mr. Ott asked

plaintiff both whether he asked for Mr. Turrell's help and why he did not; plaintiff maintained that

he should not have had to ask.[86] Similarly, Mr. Melton's attempt to corroborate plaintiff at trial

stands in stark contrast to his statements to Mr. Ott.[87]

There is no evidence to support plaintiff's current argument that his statement is unreliable

due to the circumstances of the interview.[88] While counsel argued that the pain medication affected

plaintiff's judgment, there was no testimony to support this conjecture.[89] The Court cannot find that

plaintiff requested Mr. Turrell's help during this incident. Instead, it appears that plaintiff's story

has evolved to better suit his litigation position since the time of the incident.

Next, it was negligent for plaintiff not to request any help <u>after</u> he started trying to pull. Just

---

[84] (Rec. Doc. 54 at 2-4.)

[85] (Trial Tr. 46:4-14.)

[86] (Ex. 19 at 20:11-30.)

[87] (*Id.* at 74:21-24; Ex. 20.)

[88] (*See* Rec. Doc. 56 at 9-10.)

[89] (*Id.* at 44:18-45:18.)

as Mr. Melton could tell that the fish were getting the best of plaintiff before his injury,[90] so too should plaintiff have been aware. Once the mate gets a hold of the net, he has the option and the duty to ask for help directly if the net is too heavy for him to handle.[91] The mate is in charge of the mate's boat.[92] He has to decide whether a crew member is needed at the bow, even if that person is otherwise occupied. He also has a duty as supervisor to identify when a crew member is "slacking," as it appears Mr. Turrell was, and correct that individual.

Finally,[93] plaintiff was negligent for failing to release the net before he sustained an injury. Plaintiff admitted that his hands were not trapped in the net.[94] Thus it was possible for him to let go. Further, a reasonable mate in his position would have let go under those circumstances. Although dropping the net may have resulted in some fish escaping, Captain Harcum left little doubt that he had let go of nets in the past and would do so again if his safety were threatened.[95] A seaman cannot escape liability for contributory negligence simply because he was acting in his employer's

---

[90] (See Ex. 20, at 10:20-24, 17:30-18:5)

[91] (Trial Tr. 108:8-16; Ex. 5-005.)

[92] (Eldridge Dep. 30:17-20.)

[93] To the extent that plaintiff still contends he was required to bend at an awkward angle to pick up the net, Omega would argue that plaintiff was not required to do so and was in fact negligent for doing so. (*See* Rec. Doc. 54 at 6, 10). The Court does not address this issue, as it has either been waived by the failure to include it in the Pretrial Order or dismissed with plaintiff's unseaworthiness claim in the Court's order granting in part summary judgment. (Rec. Doc. 40.)

[94] (Trial Tr. 49:5-50:5.)

[95] (Trial Tr. 108:17-109:11; Ex. 5-005.)

perceived interest when he injured himself.[96]

While plaintiff may not recover for damages caused by the aforementioned contributory negligence, this fact does not necessarily absolve Mr. Turrell of responsibility or dispose of plaintiff's negligence claim. Omega is responsible for any role that Ben Turrell's conduct played in producing plaintiff's injury, no matter how slight, to the extent that conduct was negligent.[97] Just as a seaman owes a duty of reasonable care for his own safety, he owes the same duty to his fellow seamen for their safety.[98] This duty entails legal responsibility for reasonably foreseeable risks created by the seaman's acts and omissions.[99]

It is undisputed that Mr. Turrell was responsible for helping plaintiff remove slack from the net when he was finished helping to secure and spread the bunt pile, whether he was asked to do so or not.[100] Plaintiff personally instructed Mr. Turrell that this was part of his job.[101] This responsibility exists both to expedite fishing for Omega's benefit, and to help the mate avoid injury.[102]

---

[96] *Cf., e.g.*, *Pallis v. United States*, 369 F. App'x 538 (5th Cir. 2010); *accord Gautreaux*, 107 F.3d at 339 (overruling *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975)).

[97] *Chisholm*, 679 F.2d at 62 (citing *Rogers*, 352 U.S. at 506, 77 S. Ct. 443, 448, 1 L.ED.2d 493 (1957)). To whatever degree Omega would argue that plaintiff's contributory negligence should supersede any by itself or its employees, it is questionable whether that legal concept continues to apply in Jones Act cases after the Supreme Court's decision in *CSX Transp. Inc. v. McBride*, 564 U.S. __, 131 S. Ct. 2630 (2011). *See McBride*, 564 U.S. at __, 131 S. Ct. at 2652 (Roberts, C.J., dissenting).

[98] *See Neill v. Diamond M. Drilling Co.*, 426 F.2d 487, 490 (5th Cir. 1970).

[99] *Id.*

[100] (Trial Tr. 64:17-25; Davis Dep. 12:23-13:8; Eldridge Dep. 25:12-26:18.)

[101] (Ex. 19, at 20:27-30.)

[102] (*See* Ex. 20, at 12:7-9.)

The evidence supports that Mr. Turrell was not doing any assigned task when plaintiff was injured. Plaintiff testified to this effect at trial.[103] He was further very consistent in this detail when interviewed by Mr. Ott. When asked why he was pulling the net by himself, plaintiff stated that the bowmen he had been working with would not "come up and help."[104] When asked what Mr. Turrell was doing during the accident, plaintiff replied that he was sitting down and trying to look busy.[105] Mr. Melton gave similar testimony, although he believed that Mr. Turrell was standing up.[106]

It is difficult to imagine that it took Mr. Turrell and another person 20 or even 10 minutes while the mate was pulling just to finish the bunt pile mens' duties. The Captain's boat had a single bunt pile man who was able to do that task *and* help Mr. Melton at the bow in much less time.[107] Mr. Eldridge testified that only two men are really required to do all of the tasks at the back of the boat, including the bunt pile work.[108]

On the evidence presented,[109] the Court accepts that Mr. Turrell was negligently slacking

---

[103] (Trial Tr. 17:17-21.)

[104] (Ex. 19, at 16:8-11.)

[105] (*Id.* at 21:4-11.)

[106] (Trial Tr. 64:2-7.) While Mr. Melton told Mr. Ott repeatedly that everyone on the mate's boat was helping at the stern when plaintiff hurt his back, (Ex. 20, at 20:11-22, 26:12-15), he testified at trial that he made these statements because he did not want to get anyone on the Mate's boat in trouble. (Trial Tr. 84:21-24.) Considering the totality of the evidence and Mr. Melton's demeanor at trial, the Court accepts the testimony as true.

[107] (Trial Tr. 75:2-8.) Mr. Melton speculated that the difference was due to the inexperience of the crew on board the mate's boat; (*id.*); however, this appears to be nothing more than Mr. Melton's speculations.

[108] (Eldridge Dep. 28:2-8.)

[109] Neither party attempted to introduce Mr. Turrell's testimony or account of events.

when this incident occurred and that this slacking was a producing cause of plaintiffs' injury.[110]

Therefore, plaintiff and Mr. Turrell should share responsibility for this accident.

*C. Neither Omega nor Captain Harcum was Negligent in Hiring or Retaining Ben Turrell.*

Finally, plaintiff has argued that Omega and Captain Harcum were negligent for accepting Ben Turrell on plaintiff's crew for the 2013 season or failing to terminate him before this accident.[111] "A shipowner is liable for negligent failure to select a competent master and crew."[112] Following the same logic, the shipowner can be liable for the master's choice of crew, to the extent that it is negligent. However, the shipowner and master only owe a duty of reasonable care in making their selections.[113] They are not absolutely liable when a crew member fails to perform according to expectations.

The evidence does not support that Captain Harcum or Omega failed to exercise due care in hiring or retaining Ben Turrell for the 2013 season. Captain Harcum specifically testified that he did not believe Turrell was a danger and would not have hired or retained him had he thought otherwise.[114] The fact that Ben Turrell was the last resort does not necessarily mean that he was an unreasonable choice for an employee.

Turrell's 2011 performance evaluation only shows that he was rated "Unsatisfactory/Must

---

[110] (*See* Ex. 19, at 16:12-14.)

[111] (Rec. Doc. 56 at 4-6.)

[112] *Kersey v. American River Transp. Co.*, 353 F. Supp. 2d 683, 696 (E.D. La. 2004) (quoting Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-22, at 348 (4th Ed. 2004)).

[113] *Id.*

[114] (Trial Tr. at 102:17-103:8.)

Improve" in the "Dependability" category of his employee evaluation.[115] While "Dependability"

relates to whether an employee "can be trusted to carry out assignments conscientiously,"[116] not all

assignments on board a vessel have safety implications. There is no explanation of how Turrell

earned this rating, and nothing to indicate that he engaged in the kind of reckless, callous omissions

that he committed in this case.

Captain Harcum's general statements about Turrell's bad attitude, poor initiative, and

problems with authority are insufficient to support liability for negligent retention.[117] In the realm

of specifics, all that Captain Harcum knew was that Turrell had failed to set the rings properly when

he was given that assignment and that he would go to the bathroom when the other crew members

were washing the boat.[118] These examples are qualitatively different from the conduct displayed

before plaintiff's injury.

Finally, although it appears that Turrell had previously refused to help plaintiff bring up the

net,[119] there is no evidence that <u>Captain Harcum</u> knew this. Plaintiff, as Turrell's immediate

supervisor, had an obligation to convey this information to the Captain, to the extent termination was

warranted. The evidence does not show that plaintiff complied with this obligation.[120]

In short, there is no proof that Ben Turrell's negligence was reasonably foreseeable at the

---

[115] (Ex. 2-001.)

[116] (*Id.*,)

[117] (Trial Tr. 91:13-94:1.)

[118] (*Id.*)

[119] (Davis Dep. 13:9-14:2.)

[120] (*Cf.* Trial Tr. 18:9-13) (plaintiff failing to explain what he told Captain Harcum about Ben Turrell's behavior); (*id.* at 35:20-36:1) (admitting that Turrell was never written up).

time of his hiring for the 2013 season or that his behavior during that season would have prompted a reasonable employer to terminate him before the accident. Accordingly, plaintiff cannot recover for negligent hiring or retention.

III. Apportionment of Liability

Because plaintiff and Omega are liable for concurrent negligence which led to plaintiff's injury, the Court must apportion responsibility for this accident as between plaintiff and Omega's employee, Ben Turrell. Under the circumstances, plaintiff is seventy (70) percent responsible for his own injury. Ben Turrell is seventy (30) percent responsible for plaintiff's injury. Accordingly, plaintiff and Omega shall share responsibility for damages 70/30.

**CONCLUSION**

Plaintiff injured his back when both he and Mr. Turrell omitted professional obligations that existed for plaintiff's safety. Omega is liable for 30 percent of plaintiff's damages. A telephone conference shall be held with the Court's case manager to develop schedule for resolving the remaining claims and issues in this case.

New Orleans, Louisiana, this 2nd of September, 2014.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE